**Opinion filed November 19, 2020**



**In The**

# Eleventh Court of Appeals

_____

**Nos. 11-18-00308-CR, 11-18-00309-CR, & 11-18-00310-CR**

_____

**DANIEL CHARLES JACKSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 32nd District Court**

**Nolan County, Texas**

**Trial Court Cause Nos. 12369, 12525, & 12587**

## MEMORANDUM OPINION

In separate indictments, the grand jury indicted Appellant, Daniel Charles Jackson, for the offenses of knowingly delivering one to four grams of heroin, by constructive transfer, to John Murphy on June 6, 2017; knowingly delivering one to four grams of heroin, by constructive transfer, to John Murphy on July 25, 2017, with the intent to establish, maintain, or participate in a combination or in the profits

of a combination who collaborated in carrying on said criminal activity; and, finally, knowingly possessing, with the intent to deliver, one to four grams of methamphetamine on October 30, 2017.[1]

In a consolidated trial, the jury found Appellant guilty of all three offenses. Appellant pleaded true to an enhancement allegation in trial court cause nos. 12525 and 12587. The jury assessed punishment in trial court cause no. 12369 (our Cause Number 11-18-00308-CR) at confinement for seventy-five years and a fine of $7,500. The jury assessed punishment at confinement for seventy-six years and a fine of $10,000 in trial court cause no. 12525 (our Cause Number 11-18-00309-CR). In trial court cause no. 12587 (our Cause Number 11-18-00310-CR), the jury assessed Appellant's punishment at confinement for seventy-four years and a fine of $5,000. The trial court sentenced Appellant accordingly. We affirm the conviction but reverse and remand for a new punishment hearing in trial court cause no. 12369; we affirm the trial court's judgments in trial court cause nos. 12525 and 12587.

Appellant brings three issues on appeal. In his first issue on appeal, Appellant maintains that the evidence is insufficient to establish that Appellant constructively delivered heroin to John Murphy.

John H. Murphy is a special agent with the Criminal Investigations Division of the Texas Department of Public Safety. At the time of trial, Special Agent Murphy had worked for the Texas Department of Public Safety for approximately thirty years; he had worked narcotics for approximately twenty of those thirty years. His "group" covered a nineteen-county area that included Nolan

---

[1]The June 6, 2017 transaction is the subject of the appeal in our Cause No. 11-18-00308-CR and trial court cause no. 12369. The July 25, 2017 offense of engaging in organized criminal activity is the subject of the appeal in our Cause No. 11-18-00309-CR and trial court cause no. 12525. The methamphetamine charge is the subject of the appeal in our Cause No. 11-18-00310-CR and trial court cause no. 12587.

County.  Although Special Agent Murphy's duties included "criminal investigations, anything from theft to gang activity," his primary focus was on narcotics.

In March 2017, Special Agent Murphy began an investigation into the distribution of methamphetamine and heroin in Sweetwater.  His investigation included Richard Darnell Amos, Derrick Morris, Kimberly Hutson, and Salena Hutson.  Special Agent Murphy's investigation "intertwined" with an investigation that a "coagent" was working; that other investigation involved Appellant.  Special Agent Murphy acted primarily in an undercover capacity during the investigation.

In March 2017, Special Agent Murphy found out that Derrick Morris, also known as "C4" or "Casino," was distributing methamphetamine and cocaine in Sweetwater.  Special Agent Murphy had a call or text message sent to Morris in which he asked for "yellow."  "Yellow" was a nickname for methamphetamine. Morris provided a phone number for "Rich" and told Special Agent Murphy to call Rich.  "Rich" was Richard Darnell Amos.

Special Agent Murphy sent a text message to Amos and asked Amos whether he had "work," a slang term for "[d]o you have drugs to sell."  Amos questioned Special Agent Murphy as to how Special Agent Murphy got Amos's name. Ultimately, Amos told Special Agent Murphy to meet him at 1402 Hughes Street to purchase the drugs.

Special Agent Murphy then met with other special agents and two deputies from the Nolan County Sheriff's Office.  The purpose of the meeting was to establish a surveillance operation and to lay out a plan for execution of the drug transaction and for protection of the undercover officer.  Audio and video recordings are made of undercover drug transactions, and team members can watch the transaction in real time.

3

Subsequently, Amos changed the meeting place to Appletree Apartments, and then later, the meeting place was changed to a Sweetwater convenience store. Amos and Special Agent Murphy met in the restroom at the convenience store. Amos handed Special Agent Murphy approximately eight grams of methamphetamine, and Special Agent Murphy paid Amos $200. An audio and video recording of the transaction was admitted into evidence at trial.

After the buy had been completed, one of the surveillance units followed Amos to determine where he went. Amos went to the Appletree Apartments, which was one of the alternate meeting locations that Amos had given to Special Agent Murphy. It was later determined that a man by the name of Jederreo "Bubba" Matthews lived at those apartments.

On April 20, 2017, Special Agent Murphy again contacted Amos to purchase more methamphetamine. This time the buy was completed inside the residence at 1402 Hughes Street. The same surveillance procedure was followed in connection with this methamphetamine purchase as with the first.

Special Agent Murphy did not arrest Amos for these transactions because he did not "want to stop at the street-level dealer." Special Agent Murphy testified that he wanted to "take it to the next level or get all involved that [he could] that were actually dealing drugs within this organization."

On May 11, 2017, Special Agent Murphy decided to "show up cold" at the Hughes Street address to attempt to purchase heroin. Special Agent Murphy testified that, by this time, he had discovered that Amos was connected, at some level, with Appellant. When Special Agent Murphy eventually met Amos on the front porch of the house, Amos asked him if he wanted the same as before. Amos delivered methamphetamine to Special Agent Murphy, and Special Agent Murphy asked Amos if he had a heroin connection. Amos replied that he might have one by the

4

next time Special Agent Murphy came to see Amos and that he would get with someone to provide heroin.

On June 6, 2017, Special Agent Murphy again showed up cold at the Hughes Street address. He did not call ahead because he was hoping that the heroin would not be at that location and that Amos would lead him to Amos's source. Amos was not present at the Hughes Street address, and Special Agent Murphy phoned Amos on a new number that Amos had given him. Amos told Special Agent Murphy that he had drugs to sell but did not have any heroin. If he did get some heroin it would cost $80 per gram. Four minutes later, Amos called back and told Special Agent Murphy that he could get the heroin but that it would cost $100 per gram. Special Agent Murphy told Amos that he wanted $200 worth. Special Agent Murphy and Amos agreed that Special Agent Murphy would take Amos to the location where Amos could get the heroin.

Special Agent Murphy was later able to discover that, during the approximate four minutes that elapsed between the time that he completed his call to Amos and the time when Amos called him back, Amos called a number shown to belong to Aubrey D. Jackson. In the course of his investigation, Special Agent Murphy had come to know of Appellant as "D." Special Agent Murphy "plugged" the phone number that Amos had called into Facebook; the number showed to be that of "Aubrey Jackson parenthesis D." Special Agent Murphy later confirmed that information through a search of Appellant's cell phone records. The tattoos shown in the photos on the Facebook account were consistent with those on Appellant's person.

After Special Agent Murphy picked Amos up at Amos's residence, 1402 Hughes Street, Amos directed him to 926 Roscoe Street. When they arrived, Special

Agent Murphy saw a man sitting outside. The man "definitely looked like the driver's license photo we had for Daniel Jackson."

Because Special Agent Murphy and Amos's supplier had not done business before, Amos made it clear that the supplier would not meet with Special Agent Murphy and that Special Agent Murphy was not going to be able to go into the house. Special Agent Murphy gave Amos the money for the buy. When Amos went up to the house, the man "believed to be D. Jackson" went into the house with Amos. Three minutes later, "Amos and Mr. Jackson walked back outside." Amos came to Special Agent Murphy's vehicle with the heroin. At trial, Special Agent Murphy identified Appellant as the man who he believed to be at the house where the heroin transaction took place.

On June 17, 2017, Special Agent Murphy received a text message, the content of which was, "Hey, bro." Because the text came from Amos's number, Special Agent Murphy assumed that it was from Amos. The next day, Special Agent Murphy responded, "Hey, bro." He received the reply, "Call me." Special Agent Murphy made the call and thought that he was calling Amos, but a female answered and "identified herself as Rich's girl."

Special Agent Murphy knew that the female was Kimberly Hutson. Kimberly asked Special Agent Murphy if he would work for her. On June 19, 2017, he set up a buy from Kimberly. Kimberly told Special Agent Murphy that her daughter, whom Special Agent Murphy came to know as Salena Hutson, would handle the transaction; Salena was seventeen years old at the time. The completed methamphetamine transaction was, like the others, recorded by audio and video equipment.

On July 25, 2017, Special Agent Murphy went to Amos's house. Amos got into Special Agent Murphy's vehicle, and Special Agent Murphy asked Amos about

6

heroin. Amos placed a call but connected with a voice mailbox. The number that Amos called was assigned to "Aubrey Jackson, D." After Amos got the voice mailbox, he sent a text message to the same number. Shortly, "Mr. Jackson" sent a text to Amos. After Amos received the text, he told Special Agent Murphy, "Come on. Let's go." Amos then directed Special Agent Murphy to 113 Robert Lee Street, which was the location of a suspected trap house—a house in which no one lives that is used for dealing drugs.

When they arrived at 113 Robert Lee Street, Special Agent Murphy gave Amos $300 to buy the heroin. Amos went into the house. Special Agent Murphy waited a few minutes and went to the front door and knocked. Amos came to the door, and Special Agent Murphy gave him another $100 to add to the amount he wanted to buy. Because Amos would not let him in the house, Special Agent Murphy went back to his vehicle. Amos subsequently came out of the house with the heroin.

Approximately forty-five minutes after the heroin transaction was completed, personnel from the Nolan County Sheriff's Office went to 113 Robert Lee Street. One member of the Nolan County Sheriff's Office who went to that house was Investigator Sergeant Angie Collier. Sergeant Collier volunteered to go to that address to attempt to identify the people who were there. When Sergeant Collier knocked on the door of the residence, Appellant answered the door. Sergeant Collier was also looking for a wanted person, and she asked Appellant whether he knew the wanted person.

Sergeant Collier entered the house. Appellant was sweating profusely and breathing heavily. Sergeant Collier thought that she might have to call emergency personnel. Appellant told Sergeant Collier that he was cleaning the house to get it

7

ready to rent. Sergeant Collier testified that it did not appear that anyone could live in that house.

Deputy Stacy Villanueva went to the location at the same time as Sergeant Collier. Deputy Villanueva testified that she was involved in an investigation of Appellant for drug dealing activity in Nolan County. She checked the outside of the house at 113 Robert Lee Street, and there was no one outside.

At some point, Deputy Villanueva "stepped into the living room." Sergeant Collier was in the house at that point. Deputy Villanueva saw Appellant and another man in the house at that time.

On October 17, 2017, Special Agent Murphy presented the results of his investigation to the district attorney. Warrants for Appellant's arrest were issued on October 18.

Special Agent Murphy testified that, on October 30, "we" saw Appellant at 113 Robert Lee Street. Law enforcement personnel formed an arrest team to effect Appellant's arrest.

As the arrest team had planned, Deputy Villanueva made the actual arrest. When Deputy Villanueva knocked on the door, Appellant answered it, and as he tried to go back into the house, she arrested him. Except for other law enforcement personnel, Deputy Villanueva saw no other people there.

At the time of the investigation, Shawn Lewis was a special agent for the Texas Department of Public Safety; he worked with Special Agent Murphy in this investigation as well as in other investigations. Special Agent Lewis was a part of the arrest team that arrested Appellant. Special Agent Lewis participated in "clearing" the house for officer safety. In the process of clearing the house, he noticed that there were baggies, loose marihuana, and scales, mostly in the living room. No one other than Appellant was in the house at that time.

8

After Appellant declined to consent to a search of the premises, Special Agent Murphy applied for and got a search warrant. During the time that Special Agent Murphy was obtaining the search warrant, Special Agent Lewis and some of the other law enforcement personnel secured the house to be sure that no one entered it.

When Special Agent Murphy returned with the search warrant, he participated in a search of the premises. In that search, law enforcement personnel found two sets of scales for weighing drugs, one of which had drug residue on it. They also found packaging materials of the type used for drug dealing, methamphetamine, loose marihuana, and one or more electronic devices such as cell phones and tablets.

The day after the search warrant was executed, Special Agent Murphy and Deputy Villanueva talked with Appellant at the jail. Special Agent Murphy testified that Appellant admitted selling marihuana and heroin from the 926 Roscoe Street address and the 113 Robert Lee Street address. Appellant said that he was participating with or working for Jederreo Matthews, also known as "Bubba." Appellant also said that Bubba was his "source of supply" for the drugs.

Appellant also told Deputy Villanueva and Special Agent Murphy that he had been out of business for a while because he had been out of methamphetamine. However, Special Agent Murphy testified that extraction reports, which were admitted into evidence, from Appellant's phone showed that there were multiple transactions in which Appellant repeatedly agreed, within two months of his arrest, to furnish illegal drugs to known addicts and dealers. The last of those was the day before Appellant was arrested. Special Agent Murphy testified that the extraction reports indicated to him that Appellant was involved in the distribution of illegal narcotics. One of the numbers stored on Appellant's phone was stored under the name "Bubba."

Special Agent Murphy testified that it was his opinion that Appellant was engaged in the organized criminal activity of distribution of methamphetamine and heroin. He believed that, based upon the evidence and what Appellant had told him, Appellant was involved in that criminal activity with Matthews, Amos, and others.

In his first issue on appeal, Appellant maintains that the evidence is insufficient to support a finding that he is guilty of delivery of heroin by constructive transfer. His argument is based upon the idea that "Murphy was not a party to or even within earshot of any transaction between Amos and Jackson in the alleged trap houses." Appellant further argues that, even if he did give drugs to Amos, "he could not care less what Amos did with them, much less direct or urge him to deliver them to a third party." Therefore, Appellant asserts, the evidence is insufficient to show a constructive transfer of heroin.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The trier of fact may believe all, some, or none of a witness's testimony because the factfinder is the sole judge of the weight and credibility of the witnesses. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). We defer to the factfinder's resolution of any conflicting inferences raised by the evidence and presume that the factfinder resolved such conflicts in favor of the

verdict. *Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The factfinder may "draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19. When we review the sufficiency of the evidence, we look at "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). It is not necessary that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) ("[I]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.")).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). We use the same standard to review both circumstantial and direct evidence cases. *Id.*

For the evidence to be sufficient in cases that involve the constructive delivery or transfer of drugs when the transferee is not the immediate transferee, a defendant must have had either "direct or indirect control of the substance transferred" and "the transferor must know of the existence of the transferee." *Sims v. State*, 117 S.W.3d 267, 277 (Tex. Crim. App. 2003). A "defendant must have contemplated that there would in fact be a third party transferee." *Id.* It is not necessary, however, for the State to prove that Appellant knew the identity of the ultimate recipient of the drugs,

11

only that Appellant knew that his initial transfer was not the end of the distribution cycle. *Daniels v. State*, 754 S.W.2d 214, 222 (Tex. Crim. App. 1988).

The June 6, 2017 heroin buy, and the heroin buy on July 25, 2017, are the two transactions that are the subject of Appellant's first issue on appeal. When Appellant first sought to buy heroin from Amos, Amos made it clear that he did not have any heroin but that he would try to get some before they met again. The next time that Special Agent Murphy and Amos met, Special Agent Murphy again asked for heroin. Amos did not have heroin, but after he made a phone call, he had Special Agent Murphy drive him to 926 Roscoe Street. Phone records show that the call was made to Appellant.

When Special Agent Murphy and Amos arrived at the Roscoe Street address, Appellant was outside. Amos and Special Agent Murphy were in the same vehicle. Amos told Special Agent Murphy that he could not go inside the house because Appellant and Special Agent Murphy had not had dealings before; Special Agent Murphy remained in his vehicle. Amos and Appellant went inside. A few minutes later, Amos returned with the heroin. Special Agent Murphy was sitting in his vehicle outside the house during all this time.

On July 25, 2017, Special Agent Murphy again contacted Amos for the purpose of purchasing heroin. After he communicated by text with Appellant, Amos told Special Agent Murphy to drive to 113 Robert Lee Street, the location of a suspected trap house. Amos and Special Agent Murphy arrived at the location in the same vehicle. Once again, Amos went into the house. However, on this occasion, after he waited a few minutes, Special Agent Murphy went to the door but Amos would not let him in. Amos subsequently returned to Special Agent Murphy's vehicle with heroin that Amos did not have before.

12

We believe that this evidence, together with the other evidence to which we have referred in this opinion, along with the reasonable inferences drawn from it, when viewed in the light most favorable to the verdict, would enable a rational trier of fact to find beyond a reasonable doubt that Appellant delivered, by constructive transfer, heroin to Special Agent Murphy on June 6, 2017, and on July 25, 2017. We overrule Appellant's first issue on appeal.

In his second issue on appeal, Appellant urges us to hold that the evidence is insufficient to establish that Appellant engaged in organized criminal activity when he constructively delivered heroin to Special Agent Murphy on July 25, 2017. We have held that the evidence is sufficient to support the finding of the jury as to constructive delivery.

Appellant appears to base his argument under this issue solely upon the claim that the evidence is insufficient to prove constructive delivery. He presents neither argument nor authority directed at the elements of engaging in organized criminal activity, as set out in Section 71.02 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 71.02 (West Supp. 2020). Because we have held that the evidence is sufficient to prove beyond a reasonable doubt that Appellant constructively delivered heroin to Special Agent Murphy on July 25, 2017, we overrule Appellant's second issue on appeal.

Appellant's third issue on appeal is directed at the punishment that the jury assessed in connection with Appellant's conviction for possession of methamphetamine with the intent to deliver. He does not contest the conviction. Appellant contends that, because he was erroneously convicted in the other two cases, his sentence in the methamphetamine case was more severe than it otherwise would have been. In Appellant's words, "[h]ad [Appellant] not suffered these two serious erroneous convictions, it is probable his sentence in [the methamphetamine

13

case] would have been less." Because we have held that the other convictions were not erroneous, we overrule Appellant's third issue on appeal.

Finally, we address an unassigned error related to Appellant's punishment in trial court cause no. 12369. *See Sanchez v. State*, 209 S.W.3d 117, 120–21 (Tex. Crim. App. 2006) (acknowledging that courts of appeals are authorized to review unassigned error); *see also Mizell v. State*, 119 S.W.3d 804, 806 (Tex. Crim. App. 2003) (stating that a trial court or an appellate court that otherwise has jurisdiction over a criminal conviction "may always notice and correct an illegal sentence").

The record reflects that Appellant was charged with and convicted of a second-degree felony offense for delivering one to four grams of heroin. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(c) (West 2017). The indictment in trial court cause no. 12369 contains no enhancement allegation, and the State did not file a notice of enhancement. *See Brooks v. State*, 957 S.W.2d 30, 34 (Tex. Crim. App. 1997) (holding that prior convictions used as enhancements must be pled in some form); *accord Villescas v. State*, 189 S.W.3d 290, 294 (Tex. Crim. App. 2006) (concluding that notice requirement dictated by *Brooks* is of constitutional origin). Nor did Appellant enter a plea to an enhancement allegation in trial court cause no. 12369 as he did in the other two causes. Thus, the applicable range of confinement available for Appellant's conviction in trial court cause no. 12369 was confinement for a term of not more than twenty years or less than two years. PENAL § 12.33(a) (West 2019). The trial court instructed the jury to assess Appellant's punishment within the range for that of a first-degree felony—confinement for life or for a term of not more than ninety-nine years or less than five years. *See id.* § 12.32(a). The jury assessed Appellant's punishment at confinement for a term of seventy-five years, and the trial court sentenced him accordingly.

Appellant's sentence exceeded the maximum authorized by law for an unenhanced second-degree felony.

Regardless of whether the error in trial court cause no. 12369 is deemed to be jury charge error, *see Sanchez*, 209 S.W.3d at 121–22, or an illegal sentence, *see Mizell*, 119 S.W.3d at 806, we conclude that we must reverse the trial court's judgment with respect to punishment. The unobjected-to error in the jury charge caused egregious harm and resulted in a verdict that was not authorized by law and in the imposition of an illegal sentence. A sentence is "unauthorized by law" and "illegal" if it is outside the maximum or minimum range of punishment. *Mizell*, 119 S.W.3d at 806. An unauthorized punishment is void. *See Ex parte Johnson*, 697 S.W.2d 605, 606–07 (Tex. Crim. App. 1985).

In trial court cause no. 12369, we affirm the judgment of the trial court as to Appellant's conviction, but we reverse the judgment insofar as it relates to punishment. We remand trial court cause no. 12369 to the trial court for a new punishment hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 44.29(b) (West 2018). We affirm the judgments of the trial court in trial court cause nos. 12525 and 12587.

JIM R. WRIGHT

November 19, 2020                        SENIOR CHIEF JUSTICE

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.