

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00229-CR
No. 02-23-00230-CR

———————————————————

MICHAEL DAVID CORONADO, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court Nos. 1672326, 1672331

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Michael David Coronado appeals his convictions for aggravated robbery and aggravated assault with a deadly weapon—a knife. *See* Tex. Penal Code Ann. §§ 22.02(a)(2) (aggravated assault with a deadly weapon), 29.03 (aggravated robbery). In three issues, Appellant argues that the trial court caused him egregious harm by failing to charge the jury on nondeadly force self-defense instead of deadly force self-defense, that the trial court erred by failing to instruct the jury on the lesser-included offense of assault in the aggravated-robbery case, and that the trial court caused him egregious harm by failing to charge the jury on self-defense for the lesser-included offense of assault. With regard to the jury charge in the aggravated-robbery case, although Appellant was not entitled to any self-defense instruction, we conclude that the deadly force self-defense instruction that was given did not cause egregious harm. With regard to the jury charge in the aggravated-assault case, we conclude that the trial court did not err by failing to give a nondeadly force self-defense instruction because there is no evidence demonstrating that Appellant displayed the knife solely to create an apprehension that he would use deadly force if necessary, thus failing to show that he was entitled to a nondeadly force self-defense instruction. Because Appellant did not request a lesser-included instruction on assault in his aggravated-robbery case, we hold that the trial court had no duty to sua sponte submit one. Accordingly, we affirm.

## II. Background

Nahesi Parmes, a barber stylist in Crowley, testified that she went to the Chase Bank to make her daily deposit on the evening of January 25, 2021. When she pulled into the parking lot, there were no other cars, but there was a man in the bushes. Parmes parked her car but left it running while she went into the ATM building. When she came out of the building, the man from the bushes walked toward her. Parmes said that the man was wearing a black hoodie, a ski mask with something wrapped around it, and some gray shorts or pants. When Parmes opened the door to her car, the man mumbled something that she did not understand. Parmes asked what he was saying, and he asked her for money; she told him to "go on." The man continued mumbling and "had his hand on the side of him." When Parmes asked what he was doing, "that's when the knife came up from underneath the jacket"; she said that "he popped [the knife] out in between his hand and the jacket." At that point, Parmes took her gun out of her bra and laid it on the dashboard.

At first, the man backed up, but then he started coming toward Parmes. After Parmes said, "What is a knife to a gun fight," the man started wiggling his knife in a circular motion and continued coming towards her; she testified that she feared for her life. The man said, "B--ch," and Parmes said, "This is not what we're going to do." He continued walking toward Parmes, but when he was three steps away from her, he

3

started walking away toward a nearby Kroger. He continued mumbling and eventually threw something at Parmes's car. Parmes called 911[1] and followed the man in her car.

Parmes watched as the man walked to the Kroger parking lot and started pulling on the door handles of parked vehicles. He approached several people who "brushed him off." The man then approached an older man (Larry Lee) after he had exited the store with his groceries and had popped open his trunk to load them into his vehicle. The man started talking to Lee and got aggressive, pulling a knife on Lee. Lee then ran back into the store. The man kicked over Lee's grocery basket, tried to stab Lee's dog (who was in the car with the window partially rolled down), and started walking towards Cousin's and Wells Fargo with his knife out.

Lee, who was retired after a thirty-year career at Bell Helicopter, testified about his encounter with the man at Kroger on the evening of January 25, 2021. Lee said that he went inside to get groceries and left his dog in the car; Lee left the window partially down so that his dog could get some air. When Lee exited the store with his shopping cart full of groceries and went to his car to unload them into his trunk, he saw a man who was standing on a grassy median near the passenger window and who was staring at him. Lee asked the man what he was looking at; the man replied, "I'm looking at you, mother f--ker." Lee told the man that he needed to move on because he was "fixing to call the cops." Lee pulled out his phone. The man told Lee, "Put that phone up[;] I want your money[,] and if you don't put that phone up, I'm going

---

[1]The recording of her 911 call was introduced into evidence.

4

to stab you." Lee put his phone back in his pocket, and the man stepped toward Lee and partially pulled a knife out of his pocket; Lee said that he saw the handle and a section of the blade. Lee testified that he was in fear of imminent bodily injury or death when the man approached him with the knife. Lee used his hand and hit the man "upside the temple," and the man fell backwards over the curb. Lee ran back inside the Kroger. Lee saw the man get up and take a couple of steps toward Kroger, before the man returned to Lee's car and started stabbing the knife at his dog[2] while "cussing up a storm." The man then went to the back of Lee's car and flipped over the grocery cart, dumping Lee's groceries on the ground, before running towards FM 1187. Lee called 911 and learned that the police were already on their way.

The police responded to the scene and apprehended the man that Parmes had described to the 911 operator; the man was ultimately identified as Appellant though he initially provided various false names.[3] The body-cam video from Appellant's arrest shows that he was found near the Wells Fargo bank with a knife in his pocket.

After Appellant was arrested, the body-cam video recorded the officer's conversation with Lee at the scene; Lee identified Appellant as the person who had attacked him. Lee said that after he had walked out of the store with his groceries, Appellant was standing there looking at him, and Lee asked what Appellant was

---

[2]Lee later testified that his dog was not harmed.

[3]One of the officer's body-cam videos demonstrates that Appellant gave the name "Clemon Klay." During cross-examination, Appellant denied having lied to the police about his name. The State played the body-cam video during rebuttal.

looking at. Appellant responded, "I'm looking at you, mother f--ker." Lee asked, "What's the problem here? What have I done to you?" Appellant pulled out a knife and said he needed money; Lee responded that he did not have any cash. Lee told Appellant that he would call the police, and Appellant told him to put his phone away and then threatened to cut Lee's "f--king throat." Appellant swung at Lee, and Lee ran into the store; Appellant then stabbed at Lee's dog who was in the car with the window partially rolled down. Lee told the officer that he feared for his life because Appellant was very near him. Lee said that if Appellant had not possessed a knife, he would have "knocked his ass out."

The body-cam video also recorded the officer's conversation with Parmes; she also identified Appellant at the scene as the person who had accosted her at Chase Bank. Parmes said that Appellant had approached her as she exited the bank and had asked her for money. Parmes told Appellant that she could not help him. Appellant mumbled some things that Parmes did not understand as she was getting in her car, and then he called her a b--ch. Parmes pulled out her gun and laid it on the dash. Appellant pulled a knife out and acted like he was going to stab her, and Parmes asked who he thought was going to win. Appellant started walking off, and once Parmes started driving away, Appellant threw something at her vehicle. Parmes said that she then called the police.

During Appellant's case in chief, he took the stand. Appellant testified that on the night in question, he was homeless and had recently gotten some money from

6

panhandling. He used the money to purchase "some of the Asian food that was right next to the Kroger." Afterwards, he walked around and asked people for money because he was not ready to go to bed and had planned to sleep in that area overnight.

According to Appellant, he saw Parmes pull up at the bank and was going to ask her for money, but then he saw her pull her gun out and put it on the dash. Appellant testified that he did not have a chance to say anything to Parmes because she "didn't give [him] a chance to say anything. . . . She had gotten an attitude with [him]"; she told him to get away from her. Appellant said that he never waved a knife around in front of her but instead took a golf ball out of his pocket and threw it at her car to try to distract her so that he could walk away.[4] Appellant then walked across the street to Kroger.

Appellant saw a man (Lee) with groceries and thought he could make some extra money by helping him put his groceries in his car. Appellant said that he did not ask Lee for money but instead asked if he "could put his grocery cart up." Appellant testified that Lee "got an attitude" with him and threatened him. Appellant said that he flipped over the grocery cart because he was trying to get away from Lee. Appellant was asked about Lee's testimony regarding pulling out his phone and stating that he was going to call the police; Appellant responded, "That didn't happen in front of me." Appellant was also asked about Lee's punching him and gave contradictory answers:

---

[4]Appellant testified that Parmes "actually put [him] in danger." He agreed that he had been afraid that Parmes was going to hurt him if he did not leave "because she's a lot bigger than [him]."

Q.  Yeah.  Did he punch you?

A.  He didn't land a hit on me, but like he tried to, and that's when I pushed his grocery cart over[] because I was trying to get away.

Q.  Did you fall backwards when he tried to hit you?

A.  Yes, sir.

Q.  So he swung at you[,] and you fell down?

A.  No.  I jumped back[,] and then I pushed the grocery cart out of the way.  I pushed the grocery cart like towards him, but it was off to the side.

Q.  Okay.  So did you fall to the ground?

A.  I did not fall to the ground.

Q.  Okay.  But he did swing at you?

A.  Yes, sir.

Q.  And you were able to duck or miss, avoid it?

A.  Like it wasn't really like a big swing, like he just put his fists up a little bit[;] you know what I mean[?]

Appellant testified that he did not pull out a knife when he was near Lee and that he does not cuss at people.  He said that after pushing the cart over, he walked away.  He said that both Parmes and Lee had bad attitudes and "kind of shooed [him] away like [he] was just some homeless kid."[5]

---

[5]It is unclear why Appellant made a reference to a kid; he testified that he was thirty-two years old.

Appellant agreed that he had encountered "a little bit of trouble with the law in the past." He admitted that he had served jail time for a felony conviction for burglary of a habitation, a felony conviction for possession or manufacture/delivery of a controlled substance, and a conviction for burglary of a building.

On cross-examination, Appellant agreed that he had a knife in his pocket that evening and that he was attempting to obtain money from both Parmes and Lee. Appellant said that Parmes had stopped him in the middle of his asking her for money and had shooed him away. Appellant explained that she had pulled a gun on him because he was a stranger to her and because he had approached her car. Appellant reiterated that he never showed Parmes or Lee his knife and said that he could not figure out how they knew that he had a knife on him on the night in question.

With regard to the encounter with Lee, Appellant said that he never got a chance to ask him for money; he was planning to do that after he asked Lee if he needed help putting his groceries in his car. Appellant opined that both Parmes and Lee could tell that he was trying to ask for money even though he "didn't get the chance to ask [them]." Appellant said that he did not have his knife out and did not try to stab Lee's dog; he merely tried to pet the dog. Appellant testified that he tried to pet the dog before he went around the car to ask Lee if he needed help with his groceries.

Appellant believed that Parmes and Lee had lied about his pulling out his knife. But Appellant agreed that Parmes had correctly testified that he had thrown something at her car and that she had put her gun on the dash. When the prosecutor

9

stated, "There's no reason two people who didn't know [Appellant] would make up this story for no reason," Appellant responded, "Of course they would. . . . There is a conspiracy against me."

After hearing the evidence, the jury found Appellant guilty of aggravated robbery of Lee as charged in the indictment and aggravated assault with a deadly weapon of Parmes as charged in the indictment. The trial court held a sentencing hearing and assessed Appellant's punishment at forty years' confinement on the aggravated-robbery charge and at thirty-five years' confinement on the aggravated-assault-with-a-deadly-weapon charge. The trial court ordered the sentences to run concurrently. This appeal followed.

### III.  The Self-Defense Instructions

In his first issue, Appellant argues that the trial court caused him egregious harm in both cases by instructing the jury that self-defense was justified only in response to deadly force. Specifically, Appellant contends that this was error because neither indictment alleged deadly force but rather use of force or threat of force. The crux of Appellant's argument is that the trial court should have given a nondeadly force self-defense instruction in both cases instead of a deadly force self-defense instruction. For the reasons explained below, Appellant's argument fails.

10

## A. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

Unless a particular statute places a duty on a trial court to give an instruction, the trial court generally need not instruct the jury sua sponte on unrequested traditional defenses and defensive issues because they are not "law applicable to the case." *See* Tex. Code Crim. Proc. Ann. art. 36.14; Tex. R. App. P. 33.1; *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *see Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008). When a trial court sua sponte instructs a jury on self-defense, as it did here, it assumes a duty to deliver a correct instruction. *Mendez v. State*, 545 S.W.3d 548, 553 (Tex. Crim. App. 2018). Because Appellant did not object to the unrequested self-defense instruction in each case, any error is subject to an egregious harm analysis. *Id.* at 552–53; *Richards v. State*, No. 05-22-01158-CR, 2024 WL 1736374, at *4 (Tex. App.—Dallas Apr. 23, 2024, no pet.) (mem. op., not designated for publication).

To determine if the jury charge egregiously harmed Appellant,

> we examine the record as a whole, including the entire jury charge, the evidence, the contested issues, and the arguments of counsel, and anything else in the record that informs our analysis. [*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).] In examining the evidence, reviewing courts must consider "the plausibility of the evidence raising the defense." *Villarreal v. State*, 453 S.W.3d 429, 436 (Tex. Crim. App. 2015). Egregious harm exists if the error affects

11

the very basis of [Appellant's] case, deprives him of a valuable right, or vitally affects a defensive theory. [*Thanh Cuong*] *Ngo*[ *v. State*], 175 S.W.3d [738,] 750[ (Tex. Crim. App. 2005)]. The record must bear out that Appellant suffered actual harm, not theoretical harm, and neither party has [a] burden to show harm. *Id.*

*Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021). "[J]ury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006).

## B.    Applicable Law

This court has previously set forth the interplay between the self-defense laws and the distinction between a nondeadly force versus a deadly force self-defense instruction as found in Penal Code Sections 9.04, 9.31, and 9.32:

> Under Section 9.31 of the Texas Penal Code, a person is justified in using nondeadly force when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force, except in the limited circumstances provided in Section 9.31(b). *See* Tex. Penal Code Ann. § 9.31(a); *Gamino*[ *v. State*], 537 S.W.3d [507,] 510[ (Tex. Crim. App. 2017)]. Similarly, under Penal Code Section 9.32, a person is justified in using deadly force if [the person] would be justified in using force under Section 9.31 and [the person] reasonably believes that deadly force is immediately necessary to protect [the person] against another's use or attempted use of deadly force. *See* Tex. Penal Code Ann. § 9.32(a)(1)–(2)(A); *Trammell*[ *v. State*], 287 S.W.3d [336,] 341[ (Tex. App.—Fort Worth 2009, no pet.)]; *see also* Tex. Penal Code Ann. § 9.01(3) (defining "deadly force" as force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury"). A "reasonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(a)(42).

Deadly[ ]force self-defense may not apply to the tried facts even if a defendant is charged with using or displaying a deadly weapon. *Gamino*, 537 S.W.3d at 510. That is because under Penal Code Section 9.04, "a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." Tex. Penal Code Ann. § 9.04. Because Section 9.04 provides that "[t]he threat of force is justified when the use of force is justified by [the self-defense] chapter" of the Penal Code, Section 9.04 is not a separate statutory defense; it is incorporated into the law of self-defense. *Gamino*, 537 S.W.3d at 510. Thus, even though [Appellant] was charged with using a deadly weapon, if the evidence presented at trial triggered the application of Section 9.04, he would be entitled to an instruction on nondeadly force under Section 9.31, rather than an instruction on deadly[ ]force self-defense under Section 9.32. *See id.*

*Windham v. State*, No. 02-19-00063-CR, 2021 WL 386951, at *12–13 (Tex. App.—Fort Worth Feb. 4, 2021, no pet.) (mem. op., not designated for publication) (footnote omitted); *see also Happy Tran Pham v. State*, 639 S.W.3d 708, 712–13 (Tex. Crim. App. 2022) (summarizing *Gamino* and stating that "Section 9.04 comes with an express limitation" because "[i]t applies only when 'the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary'"). As summarized in *Windham*, Appellant was entitled to a Section 9.04 and 9.31 instruction

if there [was] some evidence, even if contradicted, that he believed the display of his [weapon] was immediately necessary to protect himself against the victim's use or attempted use of unlawful force, that his purpose in displaying his weapon was limited to creating an apprehension that he would use deadly force if necessary, and that his conduct was not in response to verbal provocation alone.

*Id.* at *13–14.

And a person charged with robbery is not entitled to any self-defense instruction:

13

[W]hen a defendant is accused of either murder or assaulting his victim, the defendant is entitled to an instruction on the law on self-defense and/or the defense of others if he presents some evidence, even if contradicted, that he reasonably believed his use of force was immediately necessary to protect himself or a third party against his victim's unprovoked use or attempted use of unlawful force. . . . However, the same is not true when a defendant is accused of robbery. While the Penal Code allows a person to respond to another's use of force by using equivalent force to protect himself or a third party, i.e.[,] by assaulting or even killing the other person, the [Penal] Code does not allow a person to respond to another's use of force by committing a wholly unrelated offense against the person, such as by committing a robbery. Thus, as other courts have recognized, a defendant who is charged with the offense of robbery and/or aggravated robbery has no legal right to claim self-defense against his intended victim[] and is therefore not entitled to receive a self-defense instruction. *See*[,] *e.g.*[,] *Russell v. State*, No. 05-17-00124-CR, 2018 WL 525559, at *10 (Tex. App.—Dallas Jan. 24, 2018, pet. ref'd) ([mem. op.,] not designated for publication) (defendant had no right to a jury instruction on self-defense with regard to robbery allegations in indictment); *Toliver v. State*, No. 01-87-00591-CR, 1988 WL 15126, at *1 (Tex. App.—Houston [1st Dist.] Feb. 25, 1988, pet[.] ref'd) (not designated for publication) (defendant accused of aggravated robbery was not entitled to a self-defense instruction); *Gorman v. State*, No[s]. 04-03-00311-CR, [04-03-00312-CR,] 2004 WL 2450875, at *1 (Tex. App.—San Antonio Nov. 3, 2004, pet. ref'd) ([mem. op.,] not designated for publication) (defendant charged with aggravated robbery with a deadly weapon had no right to receive a jury instruction on the law of self-defense).

*Macias v. State*, No. 08-17-00144-CR, 2019 WL 4058584, at *5 (Tex. App.—El Paso Aug. 28, 2019, pet. ref'd) (not designated for publication).

### C.     The Indictments and the Jury Charges

The indictment in the aggravated-robbery case charged that Appellant

on or about the 25th day of January 2021, in the County of Tarrant, State of Texas, did intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten or place Larry Lee in fear of imminent

14

bodily injury or death, and the defendant used or exhibited a deadly weapon, namely, a knife[.] [All caps removed for ease of reading.]

The indictment in the case involving the offense of aggravated assault with a deadly weapon stated that Appellant "on or about the 25th day of January 2021, in the County of Tarrant, State of Texas, did intentionally or knowingly threaten imminent bodily injury to Nahesi Parmes, and [Appellant] did use or exhibit a deadly weapon during the commission of the assault, namely, a knife." [All caps removed for ease of reading.]

The jury charge in both cases included the following self-defense instruction:

> If you all agree the [S]tate has proved, beyond a reasonable doubt, each of the elements listed above, you must next consider whether the defendant is not guilty because his use of force was justified by self-defense.
>
> A person's use of deadly force against another that constitutes the crime of aggravated robbery[6] is justified by self-defense when the person reasonably believed the degree of force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.
>
> The use of deadly force against another is not justified in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.
>
> The defendant is not required to prove self-defense. Rather, the [S]tate must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.
>
> . . . .

---

[6]The jury charge in the aggravated assault case correctly replaced the phrase "aggravated robbery" with "aggravated assault with a deadly weapon."

15

"Deadly force" means force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury.

### D. Analysis[7]

#### 1. Self-Defense Charge in the Aggravated-Robbery Case

Appellant argues that by including a self-defense instruction, the trial court was obligated to correctly charge the jury, and thus under the evidence, the trial court should have instructed the jury on nondeadly force, rather than deadly force, self-

---

[7]Appellant's argument, which is not segregated based on the two offenses, is difficult to interpret. Under the heading stating that "[t]he trial court only instructed the jury on self-defense justified by [d]eadly [f]orce," Appellant notes that he was charged with "aggravated assault" and "aggravated robbery" and argues that "[n]either indictment alleged [d]eadly [f]orce. Both indictments alleged the [u]se of [f]orce or [t]hreat of [f]orce."

Appellant follows that section with a heading stating that "[t]he trial court should have instructed the jury on self-defense justified by the [u]se of [f]orce or [t]hreat of [f]orce." Under that heading, Appellant quotes the Penal Code's definition of deadly force, quotes from the indictment in each case regarding his threatening the victims with imminent bodily injury or death, and *admits* that each indictment alleged that he had used or exhibited a deadly weapon during the commission of the respective offenses. Appellant follows that statement with a nonsensical sentence: "However, if the allegations of a threat, then the use or exhibition of a deadly weapon does amount to [d]eadly [f]orce." He concludes that section by quoting Penal Code Section 9.04 and then proceeds to a harm analysis. Appellant's approach—quoting Penal Code provisions but not analyzing them or applying them to the facts presented here and failing to proofread to ensure that his brief presents a clear argument—puts this court in the unenviable role of mind reader. *See* Standards for Appellate Conduct, *Lawyers' Duties to the Court* ¶ 5, Texas Rules of Court (State) 320–21 (West 2024) ("Counsel will present the Court with a thoughtful, organized, and clearly written brief.") (*available at* http://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf); *see also* Tex. R. App. P. 38.1(i) (stating that appellant's brief "must contain a clear and concise argument for the contentions made").

defense. But Appellant concedes that a defendant who is charged with the offense of aggravated robbery "cannot be entitled to a self-defense instruction."[8] Appellant is correct because as explained above, a defendant who is charged with the offense of aggravated robbery has no legal right to claim self-defense against his intended victim and is therefore not entitled to receive a self-defense instruction. *See Macias*, 2019 WL 4058584, at \*5. We therefore assume that the trial court erred by giving a self-defense instruction in the aggravated-robbery case.

Despite the error, it did not cause Appellant egregious harm. An erroneous self-defense instruction does not deprive a defendant of a fair and impartial trial if the evidence does not legitimately raise the issue of self-defense. *See Richards*, 2024 WL 1736374, at \*5. Here, analyzing the *Almanza* factors, the factors weigh against a finding of egregious harm because (1) the evidence did not warrant any self-defense instruction because Appellant either approached Lee with a knife without any provocation or never displayed a knife to Lee, (2) the jury charge's self-defense instruction gave Appellant a windfall of a possible acquittal on an improper basis and elevated the State's burden by requiring it to disprove a defense to which Appellant was not entitled, and (3) the arguments of counsel about a defensive issue that was not raised by the evidence benefitted Appellant. *See Lozano*, 636 S.W.3d at 34–35

---

[8]As discussed below, Appellant also argues that the trial court should have charged the jury on the lesser-included offense of assault so that an acquittal based on self-defense could be possible.

(holding that trial court's deadly force self-defense instruction in charge did not egregiously harm appellant).

Accordingly, we hold that Appellant did not suffer egregious harm from the trial court's inclusion of the deadly force self-defense instruction in the aggravated-robbery case. We overrule the portion of Appellant's first issue that relates to the aggravated-robbery case.

## 2. Self-Defense Charge in the Aggravated-Assault Case[9]

As rephrased by the State, "The claim on appeal is that the self-defense charge should have allowed the jury to first decide whether Appellant's display of a knife was for a lawful purpose as provided by . . . Penal Code . . . [Section] 9.04" and that "[s]uch a finding would have guided the jury's determination [regarding] whether Appellant's force was deadly or nondeadly." Essentially, Appellant's argument on appeal is that the trial court should have given a Section 9.31 nondeadly force self-defense instruction instead of a Section 9.32 deadly force self-defense instruction, despite the failure of Appellant's brief to cite either of these sections of the Penal Code. As explained in the applicable-law section above, Appellant was entitled to an

---

[9]For purposes of the analysis in the aggravated-assault case, we assume without deciding that Appellant was entitled to a self-defense instruction. *See Prox v. State*, No. 2-09-232-CR, 2010 WL 2133012, at *8 & n.8 (Tex. App.—Fort Worth May 27, 2010, pet. ref'd) (per curiam) (mem. op., not designated for publication) (assuming without deciding that appellant was entitled to an instruction on self-defense even though he denied using a weapon, much less a deadly weapon, to defend himself).

18

instruction on nondeadly force self-defense under Section 9.31 if the evidence triggered application of Section 9.04. *See Gamino*, 537 S.W.3d at 510.

Here, the record sets forth three versions of the aggravated-assault offense:

- Parmes testified that Appellant popped out the knife between his shirt and jacket, that she then took her gun out of her bra and laid it on the dashboard, and that Appellant then came toward her and wiggled the knife at her.

- Parmes told police at the scene (as showed in the body-cam video) that after Appellant called her a b--ch, she pulled out her gun and laid it on the dashboard and that Appellant then pulled out a knife and acted like he was going to stab her.

- Appellant testified that he never pulled out his knife.

Excluding Appellant's testimony (which would not entitle him to any self-defense instruction) and looking solely at Parmes's trial testimony and her statement to the police, the one consistent theme is that Appellant never displayed the knife—in response to another's use or attempted use of deadly force—solely to create an apprehension that he would use deadly force if necessary. According to Parmes's trial testimony, Appellant displayed his knife before she displayed her weapon; Appellant's action, which was not in response to another's use or attempted use of deadly force,

19

thus does not fit within Section 9.04.[10]   According to the body-cam video, Parmes displayed her weapon first, laying it on the dash to create an apprehension that she would use deadly force if necessary, but Appellant responded by not just displaying his weapon but by pulling it out and acting like he was going to stab her; this behavior amounts to deadly force and therefore comes within Section 9.32.

And Appellant's testimony failed to trigger any self-defense instruction, much less one under Section 9.04 because, as summarized by the State, "Appellant denied pulling out the knife at all, denied any threat of deadly force, and denied any action [that] could have placed [Parmes] in 'apprehension that he [would] use deadly force.'" Appellant does not point to any evidence demonstrating that he displayed the knife solely to create an apprehension that he would use deadly force if necessary and thus has failed to demonstrate that he met the requirements of Section 9.04 to entitle him to a nondeadly force self-defense instruction under Section 9.31. *Cf. Sanchez v. State*, No. 09-18-00163-CR, 2020 WL 1696012, at *5–6 (Tex. App.—Beaumont Apr. 8, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that there was no evidence to justify a Section 9.31 instruction because there was no evidence that

---

[10]To the extent that Appellant testified that he felt in danger because Parmes was bigger than him, case law holds that a victim's large physical stature does not compel a finding that the defendant reasonably believed that deadly force was immediately necessary to protect himself from the victim. *See Harris v. State*, 668 S.W.3d 83, 90 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (en banc op. on reh'g).  Additionally, to the extent that Appellant possibly interpreted Parmes's initial comments—to go on and to get away from her—as a threat, verbal provocation alone is insufficient to justify self-defense. *See* Tex. Penal Code Ann. § 9.31(b)(1).

appellant used nondeadly force in response to any unlawful force of the victim and because appellant's knife was indisputably capable of causing serious bodily injury or death and because the manner in which he used the knife constituted the use of deadly force); *Smith v. State*, No. 04-95-00337-CR, 1997 WL 94151, at *2 (Tex. App.—San Antonio Mar. 5, 1997, pet. ref'd) (not designated for publication) (holding that trial court properly denied requested Section 9.04 instruction because the record did not reflect that appellant's purpose in brandishing his weapon and pointing it at the victim was limited to creating an apprehension that he would use deadly force if necessary or that his threat was in any way conditional).

Accordingly, we hold that the trial court did not abuse its discretion in the aggravated-assault case by instructing the jury on self-defense under Section 9.32. We overrule the remainder of Appellant's first issue.

## IV. The Lesser-Included-Offense Instruction

In his second issue, Appellant argues that the trial court erred by failing to give the jury the option to find him guilty of assault as a lesser-included offense of aggravated robbery. Appellant did not request this lesser-included instruction at trial. Appellant, however, implicitly contends that because the trial court gave a self-defense instruction in the aggravated-robbery case despite that self-defense is not a justification to that offense, the trial court should have sua sponte instructed the jury on the lesser-included offense of assault. Case law, however, does not support Appellant's argument.

21

If neither side requests a lesser-included instruction, the trial court need not submit one sua sponte. *See Delgado v. State*, 235 S.W.3d 244, 250 (Tex. Crim. App. 2007); *see also Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010). Moreover, if the defense did not request a lesser-included instruction, its omission is not error that the appellant can successfully claim on appeal. *See Delgado*, 235 S.W.3d at 250; *see also Tolbert*, 306 S.W.3d at 780.

Because Appellant did not request a lesser-included instruction on assault in his aggravated-robbery case, we hold that the trial court had no duty to sua sponte submit one. Accordingly, we overrule Appellant's second point.[11]

## V. Conclusion

Having overruled Appellant's first and second issues, which are dispositive of these appeals, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 11, 2024

---

[11]Because we rule against Appellant on his second issue, we need not address his third issue in which he argues that the trial court caused him egregious harm by failing to charge the jury on self-defense for the lesser-included offense of assault. *See* Tex. R. App. P. 47.1.