**Arthur Garcia SANCHEZ, Appellant**

v.

**The STATE of Texas.**

**No. PD–1754–05.**

Court of Criminal Appeals of Texas.

Dec. 13, 2006.

Stephanie L. Stevens, San Antonio, for appellant.

Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, WOMACK, JOHNSON, HOLCOMB and COCHRAN, JJ., joined.

This cause is before us for a third time. The appellant was convicted for the offense of official oppression, a Class A misdemeanor,[1] and sentenced to one year in jail, probated, and a $3,000 fine. On direct appeal, the Fourth Court of Appeals reversed the conviction and dismissed the prosecution, holding that the statute was unconstitutionally vague on its face and as applied, in violation of the Due Process Clause of the Fourteenth Amendment, and also overbroad, in violation of the First Amendment.[2] We granted discretionary review, held that the statute was neither unconstitutionally vague on its face and as applied nor unconstitutionally overbroad. We reversed the judgment of the court of appeals, and remanded the cause for the court of appeals to address the appellant's further contentions.[3]

On remand, the court of appeals once again reversed the conviction, this time remanding the cause for a new trial.[4] We granted discretionary reviewed a second time, and vacated the judgment of the court of appeals, remanding the cause to that court for reconsideration of its harm analysis.[5] On second remand, the court of appeals reconsidered the harm issue, found the error to be harmful a second time, and reversed the conviction again.[6] In the alternative, the court of appeals reversed the conviction on the basis of two other, unassigned errors it perceived in the jury charge.[7] We granted the State's petition for discretionary review for a third time, on three grounds. First, we granted review of the question whether the court of appeals properly conducted the harm analysis on remand. Second and third, we granted review of the question whether the court of appeals correctly held that the errors it perceived in the jury charge were reversible. On our own motion we granted review of a fourth issue regarding whether the court of appeals was authorized to reverse the conviction on the basis of unassigned error.[8] Should we find that

1. TEX. PEN.CODE § 39.03(a)(3) and (d).

2. Sanchez v. State, 974 S.W.2d 307 (Tex.App.-San Antonio 1998) (Sanchez I ).

3. Sanchez v. State, 995 S.W.2d 677 (Tex.Crim. App.1999) (Sanchez II ).

4. Sanchez v. State, 32 S.W.3d 687 (Tex.App.-San Antonio 2000) (Sanchez III ).

5. Sanchez v. State, 120 S.W.3d 359 (Tex.Crim. App.2003) (Sanchez IV ).

6. Sanchez v. State, 182 S.W.3d 34 (Tex.App.-San Antonio 2005) (Sanchez V ).

7. Id. at 58–64.

8. In a fourth ground for review the State had argued that the court of appeal erred to reach the unassigned errors in the jury charge without affording the parties and opportunity for further briefing. We refused discretionary review of this fourth issue, but granted review on our own motion of the question whether the court of appeals should have entertained unassigned error in the first instance.

the court of appeals properly reversed the appellant's conviction on any one of the three bases upon which it held that a reversal was warranted, then we need not reach the other two substantive issues.

We hold that the court of appeals was authorized to reach the unassigned jury-charge issues in this cause and that it properly reversed the conviction based upon the first unassigned error it identified. Accordingly, we will overrule the State's second ground for review, and dismiss the State's first and third grounds as moot.

## RELEVANT PROCEDURAL HISTORY

The appellant was indicted for official oppression in that, acting as a public servant and under color of his office or employment, he intentionally subjected Diane Gonzalez to sexual harassment.[9] "Sexual harassment" is defined to mean "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly."[10] On his initial appeal, the appellant argued that this definition rendered the statute unconstitutionally vague, both on its face and as applied to the facts

of his case. The court of appeals agreed, and reversed the conviction and ordered a judgment of acquittal.[11]

We reversed this judgment.[12] In the course of rejecting the appellant's contention that the statute is unconstitutional, we resolved an ambiguity in the scope of the requirement that the sexual conduct be "unwelcome."[13] We recognized that on the face of the statute it was unclear whether the elemental requirement of "unwelcome" was meant to modify only "sexual advances," or was also meant to modify "requests for sexual favors, or other verbal or physical conduct of a sexual nature[.]" We construed the statute to mean the latter. We also held that the culpable mental state of "knowing" applied to the element that the sexual conduct be unwelcome;[14] in other words, we construed the statute to require a showing that the appellant was aware that the alleged sexual conduct to which he was subjecting his victim was unwelcome.[15]

On remand, the court of appeals again reversed the conviction, this time remanding for a new trial.[16] The court of appeals held, *inter alia*, that the indictment was substantively defective for failing to allege the elements that this Court had construed to be contained in the statute.[17] Among the missing elements are two that are

9. Tex. Pen.Code § 39.03(a)(3).

10. Tex. Pen.Code § 39.03(c).

11. *Sanchez I*, 974 S.W.2d at 313–20.

12. *Sanchez II, supra.*

13. *Sanchez II*, 995 S.W.2d at 683–85.

14. *See* Tex. Pen.Code § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circum-

stances exist. A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.")

15. *Sanchez II*, 995 S.W.2d at 685 ("Moreover, because the statute requires that the perpetrator intentionally subjects the victim to 'unwelcome' sexual conduct, the perpetrator must necessarily be aware that the sexual conduct is in fact unwelcome to be liable under the statute."); *see also id.* at 685–86 n. 7.

16. *Sanchez III, supra,* at 701.

17. *Id.* at 694–98.

relevant here. First, the indictment failed to expressly allege that all of the alleged statutory variants of sexual conduct (not just "sexual advances") were unwelcome. Second, it failed to allege that the appellant *knew* that *any* of the instances of alleged sexual conduct were unwelcome. However, in a second petition for discretionary review, we once again reversed the court of appeals' reversal.[18] We sustained the State's contention that the appellant had failed to preserve his argument that the indictment was substantively defective, and held that the court of appeals therefore erred to reach the merits of that claim.[19] We vacated the court of appeals' judgment and again remanded the cause for the court of appeals, this time for that court to reconsider its harm analysis with respect to a second ground for reversal that it had identified in *Sanchez III*.[20]

On second remand, the court of appeals reversed the conviction for a third time.[21] The court of appeals identified three independent bases which it believed entitled the appellant to a new trial. Two of those bases were not raised in the appellant's brief, but the court of appeals reached them as unassigned error.[22] The first unassigned error the court of appeals identified was a failure of the jury charge to require the jury to find, as a prerequisite to convicting the appellant, that he committed each and every element of sexual harassment as required by our construc-

tion of the statute in *Sanchez II*.[23] Among the elements the court of appeals found lacking in the jury charge were the same two we have already alluded to with respect to the indictment. First, the jury charge failed to unambiguously require the jury to find that some of the alleged statutory variants of sexual conduct that it might rely upon to convict were unwelcome.[24] Instead, like the face of the statute itself, the jury charge only expressly required the jury to find that any "sexual advances" were unwelcome, and did not unambiguously require it to find that any "requests for sexual favors, or other verbal or physical conduct of·a sexual nature" upon which it might rely to convict were likewise unwelcome. Second, it failed to require the jury to find that the appellant *knew* that *any* of the instances of alleged sexual conduct were unwelcome.[25] The court of appeals concluded that these omissions in the jury charge caused the appellant egregious harm, and therefore reversed the conviction under *Almanza v. State*.[26]

## UNASSIGNED ERROR

Shortly after the courts of appeals acquired criminal appellate jurisdiction in Texas, it was established in *Carter v. State*[27] that those courts, like this Court when we are acting in our direct-appeals capacity, are authorized under the Texas Constitution to reach unassigned error.

---

18. *Sanchez IV, supra,* at 368.

19. *Id.* at 363–67.

20. *Id.* at 367–68.

21. *Sanchez V, supra,* at 64.

22. *Id.* at 58–64.

23. *Id.* at 59–62.

24. *Id.* at 61.

25. *Ibid.*

26. 686 S.W.2d 157 (Tex.Crim.App.1985) (opinion on State's motion for rehearing).

27. *Carter v. State,* 656 S.W.2d 468 (Tex.Crim. App.1983). *See also* George E. Dix & Robert O. Dawson, 43A Texas Practice: Criminal Practice and Procedure § 43.415, at 655 (2d ed. 2001) ("... appellate courts continue to have the authority to reverse convictions for unassigned error.")

We recently "reaffirmed" that "appellate courts are free to review 'unassigned error'—a claim that was preserved in the trial below but was not raised on appeal." [28] But errors that are subject to procedural default may not be remedied by the appellate court as unassigned error unless the error was in fact preserved in the trial court. [29]

 At issue in this case is jury-charge error—the failure to give "a written charge distinctly setting forth the law applicable to the case[.]" [30] Under our construction of Article 36.19 of the Code of Criminal Procedure in *Almanza v. State,* such a jury-charge error is regarded as "fundamental"—that is to say, it may subject the conviction to reversal on appeal regardless of whether the appellant raised an objection to it in the trial court—if that error caused the appellant "egregious harm." [31] The court of appeals did not err to reach this question as unassigned fundamental error on appeal. [32] Of course, absent a trial objection, the court of appeals was not free to reverse the conviction on the basis of jury-charge error absent a finding of the requisite egregious harm. [33] We turn next to that question.

## FUNDAMENTAL JURY CHARGE ERROR

### A. The Law

As the court of appeals recognized, jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. [34] In examining the record to determine whether jury-charge error is egregious, the reviewing court should consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. [35] In this case, the court of appeals did not examine the state of the record with respect to the two errors we address today, holding instead that it was sufficient to establish egregious harm that the jury charge authorized the jury to convict without finding every requisite element of the offense beyond a reasonable doubt. [36] Our

28. *Pena v. State,* 191 S.W.3d 133, 136 (Tex. Crim.App.2006), *citing Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim.App.1990).

29. *Pena v. State, supra; Carter v. State, supra,* at 469 n. 4.

30. Tex.Code Crim. Proc. art. 36.14.

31. 686 S.W.2d at 171–72 (construing Tex. Code Crim. Proc. art. 36.19).

32. We recently reviewed an *Almanza* analysis of another court of appeals that had reached the merits of a question of fundamental jury-charge error. *Olivas v. State,* 202 S.W.3d 137 (Tex.Crim.App.2006).

33. *Cf. Bluitt v. State,* 137 S.W.3d 51, 53 (Tex. Crim.App.2004) (even when an appellant affirmatively states on the record that he has no objection to the jury charge, he may raise jury-charge error on appeal, but appellate court may not reverse the conviction absent egregious harm).

34. *Sanchez V, supra,* at 61, *citing Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App. 1996) (plurality opinion). *See also, Almanza v. State, supra,* at 172; *Ngo v. State,* 175 S.W.3d 738, 750 (Tex.Crim.App.2005).

35. *Bailey v. State,* 867 S.W.2d 42, 43 (Tex. Crim.App.1993), *citing Almanza v. State, supra,* at 171; *Ngo v. State, supra,* at 750 n. 48.

36. *Sanchez V, supra,* at 62. The court of appeals cited our plurality opinion in *Hutch* in support of the proposition that sometimes the jury charge alone will be sufficient to establish egregious error. *Id.* at 61, *citing Hutch v. State, supra,* at 171. We need not rely upon that proposition in our own review, as explained in the text *post.*

own review of the record confirms that, considering also the conflicts in the evidence and the arguments that counsel made, the error was egregious.

## B. The Jury Charge

The jury charge abstractly defined sexual harassment in the same ambiguous terms that the statute utilizes.[37] Thus, it did not clearly inform the jury that it must find that, not only the appellant's "sexual advances," but also his "requests for sexual favors, or other verbal or physical conduct of a sexual nature," must be "unwelcome" in order to support a guilty verdict. Moreover, nowhere does the abstract portion of the jury charge inform the jury that it must find that the appellant was *aware* that *any* of his sexual conduct was unwelcome.[38] These are elemental facts. The application paragraph of the jury charge

---

**37.** C.R., at 184.

**38.** Culpable mental states are elemental. Tex Pen.Code § 1.07(22)(B). The failure to instruct the jury to find every necessary culpable mental state constitutes jury-charge error. George E. Dix & Robert O. Dawson, 43 Texas Practice: Criminal Practice and Procedure § 36.12 (2d ed. 2001).

**39.** The application paragraph reads, in its entirety:

Therefore, if you believe from the evidence beyond a reasonable doubt that on or about the 1st day of August, A.D., 1994, through on or about the 15th day of February, 1995, in Bexar County, Texas, the defendant, Arturo Sanchez, while acting under color of his office as a public servant, to-wit: an officer, employee or agent of government, namely: Chairman and Board Member of the Board of Trustees of VIA Metropolitan Transit, did intentionally subject Diane Gonzalez to sexual harassment, namely: unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, by stating to Diane Gonzalez to the effect: that if Diane Gonzalez did not have a sexual affair

does nothing to ameliorate these deficiencies.[39]

## C. The Contested Evidence

Evidence developed during the course of the trial could easily have caused the jury to question both whether the sexual conduct was unwelcome, and whether the appellant would have been aware that it was unwelcome, had it been properly instructed that it had to make such findings in order to convict the appellant. As accurately summarized by the court of appeals in *Sanchez I*, the evidence at trial showed:

The complainant Gonzalez was hired by the Board of Trustees of the [VIA] Metropolitan Transit in San Antonio as an assistant to the Board in securing federal grant money. She was placed in the Public Affairs Division of [VIA], with instructions to report to appellant, the Board Chairman. The allegations of the

with him he would fire her; or that to get an office, a secretary and a raise Diane Gonzalez must have a sexual affair with him; or that he had a sexual affair with another VIA employee and he would have a sexual affair with Diane Gonzalez; or that Diane Gonzalez should have a sexual affair with him because people already thought they were having a sexual affair; or that Diane Gonzalez *must put on lipstick*; or that he would like Diane Gonzalez to wear low-cut dresses; or that he would like Diane Gonzalez to wear black pantyhose or silk blouses because she looked better in them; or that upon seeing a bruise on Diane Gonzalez' leg, that he asked Diane Gonzalez if she was bruised from rough sex with her husband, and that he liked rough sex; or by touching Diane Gonzalez with his hand on her face, submission to which was explicitly or implicitly made a term or condition of Diane Gonzalez [sic] exercise or enjoyment of her rights, privileges, powers or immunities, then you will find the defendant guilty of official oppression as charged in the indictment.

If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

indictment were chiefly supported by Gonzalez's testimony since the matters arose in private conversations. Gonzalez commenced taping her conversation with appellant in December 1994 or January 1995. The tapes do not support the indictment's allegations. Several witnesses heard appellant tell Gonzalez to put on lipstick or makeup. The grand jury testimony by appellant was introduced. He acknowledged that on an occasion he told Gonzalez to put on lipstick because she looked pale.

Gonzalez acknowledged that she had been hired by the Board and could only be fired by the Board, but knew appellant as Chairman, had great influence and that appellant had so informed her. There was testimony that Gonzalez traveled by plane with appellant to a transportation conference in Washington, D.C., in September 1994, going earlier and coming back later than other representatives of [VIA] at the conference. Gonzalez was instructed to attend after work meetings at the bar at the Mi Tierra Restaurant several nights a week. Other evidence showed that appellant frequently called Gonzalez at her home at night and that there was concern on the part of one Board member about the relationship. Other testimony indicated that appellant prevented Gonzalez from attending some Board meetings and dictated to her which employee or employees with whom she could not have lunch.

There was no question that Gonzalez had demanded, requested, or expressed a desire repeatedly for a raise, an enclosed office, and a private secretary. One Board member testified that before Gonzalez started her $52,000 job, she requested a raise in order to influence the individuals with whom she would come into contact in the course of her employment. The request was denied.

When Gonzalez commenced her employment, there was only one enclosed office in the Public Affairs Division which at the time was occupied by appellant. A smaller enclosed office was built for appellant and the larger one was assigned to Tom Campos, a staff member by the general manager of [VIA] and appellant. The secretary whom Gonzalez shared with others testified that she typed only three letters for Gonzalez in the eight months or so that Gonzalez was employed by [VIA].

Other evidence indicated that Gonzalez was constantly inquiring about appellant's whereabouts, spent a great deal of time in appellant's office with the door closed, seemed happy and "jolly" around appellant, and fawned over him. She was always offering to take appellant to lunch or to drive him places. Appellant had a disability as a result of having polio when he was a child. Some witnesses testified that Gonzalez followed appellant around the office, even waiting for him outside the men's restroom. On one occasion, appellant was heard to tell Gonzalez that "he didn't need a shadow, that he had two at home, his mother and his dog." Gonzalez was also seen playing "patty cake" with appellant at the bar at Mi Tierra.

There was evidence of dissension in the office between Gonzalez and other women employees, some of it arising from Gonzalez's insistence that she was another employee's supervisor. Gonzalez was to complete a legislative agenda project for the Board regarding federal grant money. The report was delayed month by month and, when it was tendered to the Board in January 1995, it was found unacceptable. There was evidence that the Board was generally becoming dissatisfied with Gonzalez's work.

Gonzalez terminated her employment on February 15, 1995, and filed a EEOC complaint. Her husband and brother, both lawyers, presented a 1.2 million dollar claim to [VIA] which was refused. A civil suit was filed and the instant criminal indictment came later.[40]

Gonzalez's own testimony supplied sufficient evidence from which the jury could have rationally concluded that all of the appellant's sexual conduct listed in the application paragraph occurred, and that it was all unwelcome. Moreover, the jury could have inferred from Gonzalez's testimony that the appellant *knew* his sexual conduct was unwelcome. But as the above summary shows, evidence from other sources tended to impeach Gonzalez's testimony. That evidence suggested, alternatively, either that the appellant's conduct was not really of a sexual nature at all, or that, if it was of a sexual nature, it was not unwelcome, and/or the appellant was not aware that it was unwelcome. Thus, the parties clearly joined issue, *inter alia,* on the elemental questions of whether the verbal sexual conduct was unwelcome, and whether the appellant knew it was unwelcome. But the jury was not required to pass on that issue before convicting the appellant.

### D. The Jury Argument

The bulk of the final arguments from both parties was devoted to the evidence with respect to whether the sexual conduct occurred at all, or was, instead, a false allegation brought by Gonzalez to punish the appellant because she had not received the job amenities she expected and to deflect attention from her poor job performance. But early in her summation to the jury, counsel for the appellant also argued that any sexual conduct on the appellant's part had not been unwelcome:

So think about it, if you believe the statements, is it even sexual or an advance. And then think about the unwelcome part. It has to be unwelcome. And when you do that, think about Diane Gonzalez's behavior in the office. Think about the fact that she sat in his office, and she laughed, and she followed him around, and she looked for him, and she enjoyed his company; they acted friendly to each other, and decide whether it is unwelcome.

She came back to this theme later when she argued:

Think about her behavior at work as extremely difficult as her behavior on the witness stand, very emotional, very upset. We were told by [a defense witness] that [Gonzalez] followed [the appellant] around. So much that he finally said to her at one point, "I don't need a shadow. I have two at home, my mother and my dog."

She would wait outside the men's room for him. She would follow him down to the car, follow him to the elevator. [Another defense witness], her friend, she would sometimes go out and say, "Your husband is on the phone." Another great excuse to get away from him. But instead she would say, "Oh, tell him I will call him later." She kept right on chatting.

She was not afraid or intimidated. She would sit in his office, she would— she would close the door and people would hear her laughing and enjoying it. They had a playful bantering between the two of them. She was offering him rides, offering to take him to lunch, offering to take him to meetings.

All of this behavior says she was not afraid of him, she was not afraid. She

---

40. *Sanchez I, supra,* at 311–2 n. 6.

was so upset a year later, crying and upset here, but at the time she worked with him on a day-to-day basis, she seemed to enjoy his company and enjoy him being around.

Among other issues in the case, this argument relates to the issue of the unwelcomeness of any verbal sexual conduct on the appellant's part, as well as whether he would have been aware that his sexual conduct was unwelcome. But if the jury was inclined to construe the ambiguous jury instructions not to require a showing that any verbal sexual conduct on the appellant's part was unwelcome, it could have easily sidestepped the first issue. And the jury was never told it had to find the appellant was *aware* that *any* of his sexual conduct was unwelcome, and so it need not have addressed that issue at *all* before convicting him.[41]

### E. Egregious Harm

 The jury was instructed in such a way that it was not required to find at least two elements of the offense of official oppression to be proven beyond a reasonable doubt prior to convicting the appellant. As the evidence was developed at

trial and argued to the jury, both those elements were disputed. The jury charge authorized the jury to convict the appellant without resolving that dispute. On the facts of this case it is no exaggeration to say that the appellant was deprived of his valuable right to have a jury determination of every element of the alleged offense, and that one of his defensive theories was vitally affected, to his substantial detriment. The court of appeals did not err to conclude that the error in the jury charge was sufficiently egregious as to deprive the appellant of a fair and impartial trial.[42]

### CONCLUSION

Accordingly, the judgment of the court of appeals is affirmed.

KEASLER, J., dissented.

HERVEY, J., did not participate.

---

**41.** The jury sent out a note during deliberations in which it inquired: "Is official oppression the same as 'harassment' +/or 'sexual harassment'?" The trial court properly instructed the jury to refer back to the definitions in the jury charge. The only inference we are able to draw from this note is that the jurors apparently experienced at least some degree of confusion with respect to the parameters of the offense the appellant was charged with. Exactly what the nature of their confusion was, we cannot say as an empirical matter.

**42.** In view of this disposition, we express no opinion with respect to the other grounds upon which the court of appeals relied for reversal of the appellant's conviction, and dismiss the State's other grounds for review as moot. We presume that in any re-prosecution of the case the defect of form in the

indictment will be remedied, and therefore the question of harm under *Adams v. State*, 707 S.W.2d 900 (Tex.Crim.App.1986), will become academic. With respect to the court of appeals' second unassigned error, that the jury charge erroneously permitted the jury to convict the appellant with a non-unanimous verdict, we would simply direct the trial court's attention, in the event of re-prosecution, to our recent opinion in *Jefferson v. State*, 189 S.W.3d 305 (Tex.Crim.App.2006). Particularly relevant is Judge Cochran's concurring opinion. *Id.* at 316 (Cochran, J. concurring) ("Generally, adverbial phrases, introduced by the preposition 'by,' describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous.")