

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0290-23

### TAREQ ALKAYYALI, Appellant

### V.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

NEWELL, J., announced the judgement of the Court and delivered an opinion of the Court in which SCHENCK, P.J., RICHARDSON and MCCLURE, J.J., joined. YEARY, J., filed a concurring opinion in which SCHENCK, P.J., joined. FINLEY, J., filed a dissenting opinion. PARKER, J., filed a dissenting opinion. KEEL, J., dissented. WALKER, J., did not participate.

### <u>OPINION</u>

If a jury charge fails to require that the State prove every contested element of an offense beyond a reasonable doubt, does this

result in egregious harm?  Yes.  In this case, the jury charge authorized the jury to convict Appellant of murder without requiring that the jury find beyond a reasonable doubt that Appellant caused the victim's death.  This jury charge error resulted in egregious harm.[1]  We affirm the judgment of the court of appeals.

## Background

Appellant moved to Texas in 2009 but frequently traveled back and forth to Jordan.  In April 2017, Appellant met Wasam Moussa in Jordan.  In November of that year, Appellant and Moussa were engaged, and in August 2018, they married.  Both the engagement and marriage took place in Jordan.

Within twenty-four hours of their marriage, Moussa told Appellant and her family that she wanted a divorce.  She did not provide an explanation as to why.  Nevertheless, Moussa and Appellant remained married.  In September 2018, Appellant returned to Texas where he worked as a manager at IHOP; Moussa continued living in Jordan.  During this time, Appellant filled out immigration paperwork for Moussa

---

[1] *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (noting the right to due process and to a jury trial "entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'"); *In re Winship*, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

to come to the United States, but she continued living in Jordan with her family. Moussa repeated her request for a divorce without providing a reason for it. Neither she nor Appellant filed for divorce in either Jordan or Texas.

On May 25, 2019, Moussa moved to Texas from Jordan to live with Appellant. Three days later Appellant called Vernie "Alicia" Smith, his friend and coworker, while he was driving to work.[2] Appellant told Smith that he hit Moussa, she started screaming, he covered her mouth, and then Moussa stopped breathing.[3] Smith told Appellant to call 911 and get help. Appellant returned to the apartment and called 911. Smith also called 911 and reported that Appellant had hit his wife, covered her mouth, and that she was not breathing.

When officers from the Arlington Police Department arrived, they found Moussa unresponsive on the floor. One officer checked her pulse and began administering CPR. Paramedics then arrived, and again checked to see if Moussa had a pulse. After confirming that she did not,

---

[2] Prior to Moussa's arrival in Texas, Appellant texted Smith that he hated his job, life, and wife. Appellant also texted Smith and relayed that Moussa was being "childish" and a "bitch." Moussa deleted their photos from Facebook, then blocked Appellant from Facebook and Instagram. Additional text messages were introduced between Smith and Appellant where Appellant expressed concerns about Moussa, including her lack of respect for Appellant, that she treated him like "shit," and that she "has a black soul."

[3] Appellant's first language is Arabic. He testified that the English translation of the Arabic word for fainting is "not breathing."

one paramedic took over and continued CPR. The paramedics also used a bag volume mask to squeeze air into Moussa's lungs before they eventually intubated her. The paramedics performed life-saving measures for approximately forty-five minutes between their time of arrival and transporting Moussa to the hospital. Moussa was never revived.[4]

## Trial

The State charged Appellant with the murder of Moussa. The indictment alleged two alternate theories:

> That Tareq Alkayyali, hereinafter called defendant, on or about the 28th day of May 2019, in the County of Tarrant, State of Texas, did then and there intentionally or knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing of circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands,

> Paragraph two: and it is further presented in and to said court that on or about the 28th day of May 2019 the defendant in the County of Tarrant and State aforesaid did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose with his hand or hands[.]

---

[4] The record does not state when Moussa was pronounced dead. James Anderson, one of the paramedics, arrived at the scene at 6:45 a.m. He testified that they arrived at the hospital at approximately 7:30 a.m. Homicide Detective Julia Hall testified that she was called at 8:00 a.m. She also testified that prior to being dispatched or called out, Moussa was pronounced dead.

Section 19.02(b) of the Texas Penal Code provides the elements for the offense of murder.[5] The first paragraph of the indictment tracks the language of section 19.02(b)(1).[6] The second paragraph of the indictment leaves out an essential element of the offense from section 19.02(b)(2).[7] That code section reads that a person commits the offense of murder if that person, "intends to cause serious bodily injury and commits an act clearly dangerous to human life *that causes the death of an individual*[.]"[8] But the indictment only alleged that Appellant had intended to cause serious bodily injury and committed an act clearly dangerous to human life without alleging that Appellant had caused Moussa's death.

The State proceeded on the theory that Appellant had strangled Moussa either by choking her or by covering her mouth so she could not breathe. The State called Alicia Smith who recounted her phone call with Appellant on the day of the offense. Smith testified that Appellant

---

[5] *See* Tex. Penal Code Ann. § 19.02(b) ("A person commits an offense if the person: (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

[6] *Id*.

[7] *Id*.

[8] *Id*. (emphasis added).

called her and told her that he had hit Moussa, she started screaming, he covered Moussa's mouth, and that she was not breathing.

Paramedic James Anderson testified that after checking Moussa's pulse he took over CPR from a police officer. Then, Anderson testified to using a bag volume mask, which squeezes air into a person and breathes for them, before eventually intubating Moussa. A laryngoscope with a camera on the end was used to determine if anything was blocking Moussa's airway while also helping guide the intubation tube. Anderson testified that he found bloody frothy sputum in the back of Moussa's throat. He stated that it is rare to see this upon initial intubation. It is usually seen after a tube has been placed and CPR has been performed for some time as a result of the trauma of pushing on someone's chest. The State asked if frothy blood could be caused by strangulation or smothering, and Anderson answered that it's possible. Anderson also recalled seeing ligature lines across Moussa's neck.

Anderson prepared a report after treating Moussa. The report indicated Moussa had a blocked airway, but Anderson testified that his report did not use the word "strangled."[9] However, the narrative notes from the emergency room stated that EMS reported patient was

---

[9] Under causes of injury, the EMT report states "asphyxia – airway blocked/choking (intentional, other(assaulted))."

strangled by male husband. Anderson testified that sometimes beliefs or opinions are relayed to a doctor to help guide treatment. But Anderson also testified that those beliefs or opinions are not noted in their documentation because the paramedics cannot prove them.

Medical examiner Richard Fries testified about the results of Moussa's autopsy.[10] Dr. Fries explained that Moussa had various lacerations and bruises on her lip as well as "indistinct" bruising on her neck and chest. He later stated that the small bruise under Moussa's chin together with less prominent, faint linear red areas were consistent with force applied at and around the neck.

Dr. Fries noted that Moussa had some blood on her face and a spot of undried blood on her chin. He further testified that if a person is suffocated or strangled that a foam or froth can develop in the throat. Dr. Fries stated that Moussa had petechial hemorrhages under her scalp but nowhere else. These can appear when the jugular vein is blocked. They can also appear in the eyes, face, and skin, but Dr. Fries testified that he did not find petechiae in these locations.

---

[10] An autopsy was performed by medical examiner Marc Krouse. However, Dr. Krause did not testify at Appellant's trial because, at that time, he had been terminated from the medical examiner's office due to his "lack of due diligence" in many of his autopsy reports. Dr. Fries testified at trial based on his own conclusions after examining the autopsy report and the pictures produced for that report.

Dr. Fries also explained that there was evidence Moussa had an issue with her cardiovascular system, specifically a ventricular septal defect. He stated that this defect, commonly referred to as a "hole in the heart," was repaired and intact. However, Dr. Fries also testified that even if Moussa's heart repair was not in place, it would take a long time for a young person to go into heart failure.

Additionally, Dr. Fries discussed Moussa's EKG from 2018, which showed nonspecific changes. These changes were to be expected because Moussa's hole was in her septum, and because the conduction system runs through there, some irregularities are expected. Therefore, Moussa's 2018 EKG was considered normal. After reviewing the autopsy report and photos of Moussa, Dr. Fries classified her death as homicide and asphyxia.

Appellant proceeded on the theory that Moussa's death was a terrible and tragic accident. Appellant testified at trial that there was tension between himself and Moussa as soon as she arrived in Texas. Moussa occupied the apartment bedroom alone, leaving Appellant to sleep on the couch for three nights. Appellant explained that the day before the victim's death, he and Moussa agreed to divorce after a loud argument. During the argument, Moussa began screaming and Appellant moved toward her to put his hand over her mouth. Appellant

stopped after Moussa screamed "don't touch me."  The next morning, Appellant and Moussa argued again as Appellant prepared for work.  The argument became physical, and Appellant pushed Moussa.  She yelled, and Appellant put his hand over her mouth to stop her yelling.  The two fell to the floor at which point Moussa bit Appellant causing him to release his hand.  However, Appellant again put his hand over Moussa's mouth to prevent her from yelling, and then she fainted.

Appellant testified that he carried Moussa to the bedroom after she fainted.  He then called his manager, Lauren Hastings, around 6 a.m. to explain he would be late for work.  Then he left.  He returned to the apartment after speaking with Alicia Smith and calling 911, as described above.  Appellant testified that things would be different if he had just left that morning to go to work.

Appellant presented testimony to develop the theory that Moussa's death was an accident and that she died due to her pre-existing heart condition, a condition which required surgery.  For example, Appellant, as well as his sister, testified that Moussa fainted at their wedding.  A wedding guest, who happened to be a doctor, encouraged Moussa to get checked out.  Days after the wedding, Moussa complained of chest pain and shortness of breath.  Appellant took Moussa to the hospital where lab evaluations were ordered as was emergency room

management. However, Moussa refused any treatment and was discharged from the hospital against medical advice.

Dr. Fries testified that Moussa's heart defect abutted her conduction system, which regulates a person's heartbeat. Dr. Fries stated that if a person has an irregular heartbeat, it can cause fainting. Furthermore, Dr. Fries noted that Moussa's hyoid bone was intact, which is evaluated in cases of strangulation. Additionally, Dr. Fries testified that Moussa did not have any bruising in her neck muscles, and further noted that Moussa did not have any ligature marks around her neck despite the testimony of James Anderson, the paramedic who testified that Moussa had ligature lines on her neck.

After the close of evidence, the court presented the jury with its charge. The abstract paragraph of the jury charge stated:

> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

The abstract paragraph of the jury charge instructed the jury on the elements of the offense. It included all the statutory elements for both theories of murder presented to the jury.

However, the application paragraph of the jury charge tracked the language of the indictment. It omitted the element "that causes the

death of an individual" from the second paragraph. So, while the first application paragraph required the jury to find every element of the offense beyond a reasonable doubt, the second application paragraph did not. Instead, the second paragraph informed the jury that it could nevertheless convict without determining whether Appellant's actions caused the victim's death. Appellant did not object to the defective jury instructions.

The State and Appellant relied upon different theories during closing arguments regarding the cause of Moussa's death. The State maintained that Appellant strangled and smothered Moussa causing her death. In its closing argument, the State pointed to Dr. Fries' testimony and to Moussa's contusions, abrasions, and petechiae on her scalp. These, the State posited, indicated that Appellant strangled and smothered Moussa for minutes.

The State noted that Appellant himself told Alicia Smith that he was going to jail for the rest of his life in a phone call he made to Smith prior to his calling 911. Furthermore, the State interpreted Appellant's testimony that things would be different if he had just left that morning to go to work and booked tickets so he and Moussa could return to Jordan to divorce as an admission to killing her. Additionally, the State argued that Moussa's heart repair was intact and not a cause for

concern. Turning to the fact that Appellant was bitten, the State surmised that Moussa bit Appellant because he was smothering her. And the bloody froth was a result of Moussa gasping for air while being suffocated.

Appellant's defensive theory sought to characterize the death of Moussa as a terrible and tragic accident. Appellant pointed to Moussa's repaired heart and numerous fainting episodes after her heart surgery. In his closing argument, Appellant noted that the extent of Moussa's heart problem was unknown because she refused to let anyone treat her. Appellant reiterated that Dr. Krouse, the original and non-testifying medical examiner, was fired for his lack of due diligence. Appellant contended, Dr. Krouse simply accepted that Moussa was strangled, as relayed in the emergency room reports, and did not work very hard on the autopsy given his lack of due diligence.

Appellant further argued in closing that Moussa had petechiae on her scalp but nowhere else. The bruising on her neck was superficial, and there was no damage to her larynx or cartilage. Appellant suggested that if you intend to kill someone, the hyoid bone is going to be broken and there will be damage to the larynx and neck muscles.

Lastly, Appellant pointed to the fact that his finger was bitten. He moved his hand back and forth to get his finger loose, applying some

force to Moussa's neck to get his finger back. Appellant concluded his argument by stating, "please, when you're looking at this evidence, you've got to hold the State to their burden and they have to prove this beyond all reasonable doubt that [Appellant] intended or knowingly killed her, and that is just not the case."

## Appeal

After the jury convicted Appellant of murder, he appealed his sentence. On appeal, Appellant argued, among other things, that he was egregiously harmed by the omission of the "causes the death of" element from the second theory alleged in the jury charge's application. The court of appeals addressed this error first, finding its resolution dispositive in this case.[11] Appellant contended that this error in the instruction allowed the jury to convict him of murder without requiring the jury to find that he caused Moussa's death.[12] While the State agreed there was error in the jury charge, it argued that Appellant did not suffer egregious harm as a result.[13]

---

[11] *Alkayyali v. State*, 668 S.W.3d 445, 452 n.9 (Tex. App.—Fort Worth 2023, pet. granted).

[12] *Id*. at 452.

[13] *Id*.

The court of appeals analyzed each of the four *Almanza* factors to determine if Appellant suffered egregious harm.[14]  First, the court of appeals explained that "the application paragraph authorized [the jury] to convict [Appellant] of murder without having to find beyond a reasonable doubt that he caused Moussa's death."[15]  Second, the court of appeals held that the state of the evidence weighed in favor of egregious harm because "[i]f even a single juror was persuaded that Moussa's health issues created enough reasonable doubt as to the cause of her death, then [Appellant] could not have been convicted of murder."[16]  As to the third *Almanza* factor, arguments of counsel, the court of appeals held that it did not weigh in favor of egregious harm, but the court did not provide much analysis on this point.[17]  Finally, the court looked at other relevant record information and held that this factor weighed in favor of egregious harm because the error affected Appellant's defensive theory.[18]

---

[14] *Id*. at 453; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

[15] *Alkayyali*, 668 S.W.3d at 454.

[16] *Id*.

[17] *Id*.

[18] *Id*.

After reviewing all four factors, the court of appeals concluded the jury charge error resulted in egregious harm.[19]  The court of appeals reversed Appellant's conviction of murder and remanded the case to the trial court.[20]  The State sought discretionary review.

## Discretionary Review

We granted the State's petition which raises the following issue:

> Does a defendant suffer egregious harm from charge error that 1) related to an element the defendant effectively conceded and which was not a realistic possibility for acquittal, and 2) was limited to a manner and means of murder neither party argued over?

The State argues that the court of appeals reversed on purely theoretical harm.  First, the State argues that a missing element is not proof of harm but rather the reason for a harm analysis. Next, the State contends that Appellant's chief defensive theory focused on a lack of criminal mental state rather than causation. Additionally, the State argues that the evidence does not show a viable causation argument and that there is no evidence to rationally support the argument that

---

[19] Appellant raised numerous points of error on appeal.  Because Appellant's sufficiency of the evidence argument was not raised in his petition for discretionary review, we will limit our discussion to whether or not he suffered egregious harm as a result of the jury charge error.  However, the court of appeals did conclude that there was legally sufficient evidence to support the jury's verdict despite agreeing with Appellant that he suffered egregious harm as a result of the jury charge error. *Id*. at 455-56.

[20] *Id*. at 457.

Appellant did not cause Moussa's death, alone or in conjunction with her alleged fainting problem.

## Standard of Review

The Supreme Court has recognized that the failure of a jury instruction to require a finding of an element of an offense beyond a reasonable doubt is not structural error and is subject to a harm analysis.[21] We recognized this in *Niles*, but in that case the element at issue was not contested.[22] In this case, it was.

When there is a claim as to jury charge error, there are two standards of review based on whether a defendant objected to the charge.[23] When a defendant objects to error in the jury charge, reviewing courts consider whether the error at issue resulted in some harm.[24] Some harm requires reversal "if the error is 'calculated to injure the rights of the defendant,'" meaning the error cannot be harmless.[25] When a defendant fails to object to error in the jury charge, reviewing

---

[21] *Niles v. State*, 555 S.W.3d 562, 570 (Tex. Crim. App. 2018) (citing *Neder v. United States*, 527 U.S. 1 (1999)).

[22] *Id*. at 571.

[23] *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022).

[24] *Id.*

[25] *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (quoting *Almanza*, 686 S.W.2d at 171).

courts consider whether the error results in egregious harm.[26]  "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory."[27]  Furthermore, egregious harm must be based on actual harm rather than a finding of theoretical harm.[28]

Egregious harm is a fact-specific analysis and is a difficult standard to meet.[29]  To determine whether jury charge error resulted in egregious harm we look at the entire record.[30]  Specifically, we consider (1) the entirety of the charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole.[31]

---

[26] *Alcoser*, 663 S.W.3d at 165.  Judge Finley argues that we should not hold there was egregious harm because doing so might incentivize defense attorneys to fail to object, but this would be true in any circumstance in which error amounted to egregious harm, and no one has asked this Court to revisit *Almanza v. State*.  More importantly, the responsibility for properly instructing the jury on the law applicable to the case falls on the trial court not the litigants.  *See* Tex. Code Crim. Proc. Ann. art. 36.14 ("[T]he judge shall, before the argument begins, deliver to the jury, except in pleas of guilty, where a jury has been waived, a written charge distinctly setting forth the law applicable to the case[.]").

[27] *Alcoser*, 663 S.W.3d at 165.

[28] *Id*.; *see also Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

[29] *Alcoser*, 663 S.W.3d at 165.

[30] *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).

[31] *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Almanza*, 686 S.W.2d at 171.

**Analysis**

Just as the court of appeals did below, we will review each of the four factors in turn. We agree with the court of appeals that the first factor—the entirety of the jury charge—weighs in favor of finding egregious harm. In this case, the abstract or definitional portion of the charge properly defined murder under Section 19.02(b)(2). However, the application paragraph failed to require the jury to properly apply those definitions. Error in the abstract paragraph of a jury charge does not constitute egregious harm when the application paragraph correctly instructs the jury.[32] Reversible error may occur when the abstract paragraph fails to provide a statutory definition of an element needed by the jury to determine whether the State proved the element beyond a reasonable doubt.[33] We see no reason why a failure in the application paragraph should be treated differently.

As the instrument by which a jury is empowered to conviction, jury charges are meant to inform the jury of how to apply the applicable law to the facts of the case.[34] The charge "must contain an accurate

---

[32] *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see also Meanes v. State*, 668 S.W.2d 366, 374-75 (Tex. Crim. App. 1983) (noting that the defendant in a capital murder case did not show how he was harmed when there was an absence of an abstract charge on capital murder but the application paragraph effectively defined capital murder).

[33] *MacDougall v. State*, 702 S.W.2d 650, 652 (Tex. Crim. App. 1986).

[34] *Alcoser*, 663 S.W.3d at 164-65.

statement of the law and must set out all the essential elements of the offense."[35]  The application paragraph is the "heart and soul" of the jury charge because it "specifies the factual circumstances under which the jury should convict or acquit."[36]   The application paragraph is the section of the jury charge that applies "'the pertinent penal law, abstract definitions, and general principles to the particular facts and the indictment allegations.'"[37]

Not all errors in the application paragraph amount to egregious harm, however.  In *Vasquez*, for example, this Court held that the defendant was not egregiously harmed when the trial court failed to directly incorporate the abstract definition of the law of parties in the application paragraph.[38]  But in *Vasquez*, the application paragraph still incorporated the proper definition of the law of parties from the abstract paragraph by reference.[39]  Conversely, this Court has that held the

---

[35] *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)).

[36] *Id.* at 366.

[37] *Campbell v. State*, 664 S.W.3d 240, 246 (Tex. Crim. App. 2022) (quoting *Vasquez*, 389 S.W.3d at 366).

[38] *Vasquez*, 389 S.W.3d at 372.

[39] *Id*. at 371 (noting that the application paragraph "explicitly stated that the jury should find appellant guilty if, 'acting alone or as a party (as herein defined)").

omission of sudden passion as an element of voluntary manslaughter from an application paragraph resulted in egregious harm.[40]  In *Ruiz*, the State charged the defendant with murder and voluntary manslaughter for a shooting at a club.[41]  At the trial, the jury charge defined both murder and voluntary manslaughter, but the application paragraph failed to apply the element of sudden passion to the offense of murder.[42]  This Court held that "on the facts of this case, omission of the element of the absence of sudden passion from the charge on murder denied appellant a fair and impartial trial."[43]

In this case, the abstract paragraph of the jury charge stated:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

---

[40] *Ruiz v. State*, 753 S.W.2d 681, 687 (Tex. Crim. App. 1988).  At the time of the offense in *Ruiz*, the statute for voluntary manslaughter included sudden passion as an element of murder. "A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code Ann. § 19.04 (1973).  The current statute, now titled "Manslaughter," does not include the element of sudden passion. Tex. Penal Code Ann. § 19.04.

[41] *Ruiz*, 753 S.W.2d at 682.

[42] *Id*. at 682-83.

[43] *Id*. at 687.

This section of the jury charge tracks the language of Texas Penal Code section 19.02(b). And the first section of the application paragraph, the section that allows the jury to convict a defendant, also included this language:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in County of Tarrant, State of Texas, did then and there intentionally of knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands. . .

But the second section of the application paragraph omitted the element "causes the death of":

> or if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of murder.

As written, the jury charge authorized the jury to convict the defendant of murder without determining if his actions went beyond committing an act clearly dangerous to human life because the element "causes the death of" was missing from the application paragraph for that theory of

murder. If the jury believed Appellant's defense that he did not intend to cause Moussa's death, it would have been forced to move to the second paragraph. Applying the second paragraph, the jury's inquiry would be complete upon determining that Appellant's conduct was an act clearly dangerous to human life without deciding whether Appellant caused Moussa's death, essentially gutting Appellant's defensive theory. This factor weighs in favor of egregious harm.

Next, we consider the state of the evidence, including contested issues and the weight of the probative evidence.[44] Again, we agree with the court below that this factor weighs in favor of egregious harm.[45] The Court has held that a defendant suffers egregious harm when elements of an offense are disputed at trial and the jury is not required to find those elements to be proven beyond a reasonable doubt prior to convicting a defendant.[46] In *Sanchez*, the defendant was charged with official oppression, which includes the element "intentionally subjects another to sexual harassment."[47] "'[S]exual harassment' means unwelcome sexual advances, requests for sexual favors, or other verbal

---

[44] *Almanza*, 686 S.W.2d at 171.

[45] *Alkayyali*, 668 S.W.3d at 454.

[46] *Sanchez v. State*, 209 S.W.3d 117, 125 (Tex. Crim. App. 2006).

[47] *Id*. at 118 n.1; Tex. Penal Code Ann. § 39.03(a)(3).

or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly."[48]  The jury charge's definition for sexual harassment followed the same ambiguous terms that the statute utilizes.[49]  Because of this ambiguity, the jury charge did not clearly inform the jury that it had to find the defendant's sexual advances as well as his requests for sexual favors and other sexual conduct unwelcome in order to find him guilty.  The jury charge also failed to inform the jury that the defendant had to be aware that any of his sexual conduct was unwelcome.  The application paragraph did not ameliorate these deficiencies.[50]

There was conflicting evidence at trial in *Sanchez* on the elements of "sexual harassment."[51]  For example, there was evidence that the defendant frequently called the complainant at home and that one Board member was concerned about their relationship.[52]  Additional evidence indicated that the complainant spent a great deal of time in the

---

[48] Tex. Penal Code Ann. § 39.03(c).

[49] *Sanchez*, 209 S.W.3d at 122.

[50] *Id*.

[51] *Id.* at 122-23.

[52] *Id.* at 123.

defendant's office with the door closed.[53]  Evidence was presented that the complainant followed the defendant around the office, even waiting for him outside of the men's restroom.[54]  But there was also testimony that the defendant was heard telling the complainant that "he didn't need a shadow[.]"[55]  Thus, there was contested evidence as to whether the defendant's conduct was of a sexual nature, or if it was, whether the defendant was aware it was and that it was unwelcome.[56]  The jury charge authorized the jury to convict the defendant without the State proving at least two elements of the offense of official oppression beyond a reasonable doubt causing the defendant to suffer egregious harm.[57]

In this case, the cause of Moussa's death was a disputed element of murder under Section 19.02(b)(2).  The first part of the application paragraph required the jury to determine beyond a reasonable doubt that Appellant had caused Moussa's death under one theory of murder.  But the second part of the application paragraph did not.  It authorized

---

[53] *Id.*

[54] *Id.*

[55] *Id*.

[56] *Id*. at 124.

[57] *Id*. at 125.

the jury to convict Appellant of murder without ever deciding whether he caused Moussa's death. In this way, the jury reading the charge could essentially disregard any of the evidence Appellant pointed to under his defensive theory that the murder had been an accident.

The State argues that the issue of causation was not seriously contested. It contends that Appellant effectively conceded the issue of causation because Appellant's testimony reflected acceptance of responsibility for Moussa's death and instead focused on whether he intended for her to die. We disagree. The record shows that Appellant developed evidence to undermine the State's evidence regarding not just his culpable mental state, but also Moussa's cause of death. And as the court of appeals stated, "[i]f even a single juror was persuaded that Moussa's health issues created enough reasonable doubt as to the cause of her death, then [Appellant] could not have been convicted of murder."[58]

Appellant's defensive theory largely focused on Moussa's heart condition and fainting episodes. During the direct examination of Appellant's sister, she testified to the fact that Moussa fainted at Appellant and Moussa's wedding. A relative and doctor attending the

---

[58] *Alkayyali*, 668 S.W.3d at 454.

wedding helped.  Appellant also testified about this incident.  Appellant stated that the doctor-relative encouraged Moussa to check-in with her heart surgeon.

Appellant also testified to an incident that occurred a few days after the wedding.  After Moussa complained of chest pains and shortness of breath, Appellant took her to the hospital.  Despite orders for emergency room management and lab evaluations, Moussa refused treatment and left the hospital against medical advice.  While we do not agree with the court of appeals that the cause of death was "hotly" contested, it is nevertheless clear from the record that the issue of causation was contested and not assumed as the State argues.  And because the cause-of-death element was not included in the application paragraph, this factor weighs in favor of egregious harm.

The third factor to consider—arguments of counsel—also relates to causation.  During opening statements, defense counsel informed the jury that Moussa had a history of fainting, that she had heart surgery at the age of eighteen, and that the repaired area was close to the area of the heart that can cause fainting.  So, from the onset, Appellant at least suggested Moussa's health issues might have caused her death.  However, the State points to defense counsel's closing argument when counsel stated Appellant would take back what happened that morning

if he could.  According to the State, this is a statement of responsibility, or "but for" causation.  We disagree.

While neither party directly argued Appellant could be convicted without a finding of causation, Appellant's counsel's argument combined challenges to both intent and causation.  Specifically, Appellant argued that this was a terrible accident.  We do not take this to mean Appellant conceded causation as the State suggests.  The fact that Appellant repeatedly referenced Moussa's heart condition and fainting episodes during closing argument points to a challenge to the cause of the victim's death.  While he argued that he did not knowingly or intentionally cause Moussa's death or that he did not intend to cause her serious bodily injury, by emphasizing her heart condition and her fainting episodes he also sought to cast doubt upon the cause of death as well.  Indeed, Appellant focused on this by asking, during closing arguments, "[w]ho knows the extent of her heart problem?"  He emphasized that the answer is "we don't know" because Moussa would not let anyone look at or treat her.

Furthermore, Appellant argued that he was not even reckless because it was not possible to predict that this event would even cause her death.  Contrary to the State's contention, Appellant did not effectively concede the cause of death during the trial.  At best,

Appellant's arguments were at least a mixed bag and, therefore, this factor is a wash on the question of whether there was egregious harm.

The other relevant record information also weighs in favor of determining that Appellant suffered egregious harm from the jury charge error. While Moussa's health issues were clearly a part of Appellant's defensive strategy, he contested several other issues as to causation. Dr. Fries testified that when a person is smothered, they can develop a foam or froth in the throat due to the diaphragm moving up and down trying to move air in the lungs. While Appellant did not provide expert testimony as to other causes for the foam or froth, he did suggest that chest compressions, which Moussa received, could have provided at least a reasonable explanation that was independent of smothering.

Appellant also cast doubt on asphyxia as the cause of Moussa's death by pointing to testimony that undercut such a finding. Dr. Fries testified that the common places where petechiae can be observed in cases of asphyxiation are the eyes, face, skin, and even some organs. However, petechiae were only observed under Moussa's scalp. He also testified that there was bruising on her neck but that the bruising did not extend to her muscles. Additionally, there was no damage to Moussa's hyoid bone nor any to the cartilage of her thyroid and larynx,

all of which are examined in cases of strangulation. While we do not suggest that the evidence establishing the murder was legally insufficient, it is enough to say in this case that the issue of the cause of death was contested. We agree with the court of appeals that under the *Almanza* factors, the omission of the cause of death element in the jury charge resulted in egregious harm.

## Conclusion

In this case, the application paragraph of the jury charge did not include the "causes the death of" element of murder under Section 19.02(b)(2) of the Texas Penal Code. As a result, the jury charge failed to require that the State prove every element of the offense of murder beyond a reasonable doubt. After reviewing the record, we agree with the court of appeals that Appellant suffered egregious harm in this case. Therefore, we affirm the judgment of the court below.

Delivered: May 7, 2025

Publish